**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

   -  v.  -

ALLISON MACK,

               Defendant.

No. 1:18 Cr. 00204 (NGG) (VMS)

## <u>SENTENCING MEMORANDUM OF ALLISON MACK</u>

William F. McGovern
Sean S. Buckley
800 Third Avenue
New York, New York 10022
Tel: 212 488 1210 / 1253
William.McGovern@kobrekim.com
Sean.Buckley@kobrekim.com

*Attorneys for Defendant Allison Mack*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

   I.  Life Before Nxivm ................................................................................................ 3

   II.  Involvement in Nxivm & DOS .............................................................................. 6

   III. Aftermath of Ms. Mack's April 2018 Arrest ...................................................... 11

      A. Acceptance of Responsibility and Denouncement of Nxivm/DOS ................................. 12

      B. Decision to Plead and Cooperate Against Raniere ............................................................ 14

      C. Efforts to Rehabilitate and Make Amends ........................................................................ 17

      ███████████████████ ........................................................................................ 22

APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS ............................................. 23

   I.  The History and Characteristics of the Defendant and the Nature of the Offense (§
      3553(a)(1)) ............................................................................................................ 23

      A. The Nature and Circumstances of the Offense ................................................................. 23

      B. An Individualized Assessment of Ms. Mack's Personal Characteristics Warrants a
        Mitigated Sentence ............................................................................................................ 25

   II.  Respect for the Law and Just Punishment (§ 3553(a)(2)(A)) ............................. 28

   III. Deterrence and Protection of the Public (§ 3553(a)(2)(B and C)) ..................... 31

   IV. Provision of Needed Educational Training (§ 3553(a)(2)(D)) ............................ 33

   V.  The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6)) ............................. 35

CONCLUSION .................................................................................................................. 38

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007) ........................................................................................... 23

*Garofalo v. Gravano*,
  23 F. Supp. 2d 279 (E.D.N.Y. 1998) ............................................................... 31

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ........................................................................................... 23

*Koon v. United States*,
  518 U.S. 81 (1996) ..................................................................................... 23, 35

*Pepper v. United States*,
  562 U.S. 476 (2011) ......................................................................................... 25

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) .............................................................. 32

*United States v. Anderson*,
  533 F.3d 623 (8th Cir. 2008) ........................................................................... 29

*United States v. Autery*,
  555 F.3d 864 (9th Cir. 2009) ........................................................................... 28

*United States v. Blake*,
  89 F. Supp. 2d 328 (E.D.N.Y. 2000) ........................................................... 24, 25

*United States v. Brady*,
  No. 02-cr-1043, 2004 WL 86414 (E.D.N.Y. 2004) ........................................ 30

*United States v. Bryson*,
  229 F.3d 425 (2d Cir. 2000) ............................................................................ 25

*United States v. Carty*,
  264 F.3d 191 (2d Cir. 2001) ............................................................................ 29

*United States v. Chapman*,
  356 F.3d 843 (8th Cir. 2004) ........................................................................... 28

*United States v. Coughlin*,
  No. 06-cr-20005, 2008 WL 313099 (W.D. Ark. 2008) ................................... 30

*United States v. Cull*,
  446 F. Supp. 2d 961 (E.D. Wisc. 2006) ........................................................... 32

*United States v. Edwards*,
  595 F.3d 1004 (9th Cir. 2010) ......................................................................... 31

*United States v. Fernandez*,
  443 F.3d 19 (2d Cir. 2006) .............................................................................. 23

*United States v. Gonzales*,
   163 F. Supp. 3d 1078 (D.N.M.), *aff'd*, 844 F.3d 929 (10th Cir. 2016)....................................25
*United States v. Harding*,
   No. 05-cr-1285-02, 2006 WL 2850261 (S.D.N.Y. 2006) ......................................................26
*United States v. Hasanoff*,
   No. 10-CR-162 (KMW), 2020 WL 6285308 (S.D.N.Y. Oct. 27, 2020)..................................30
*United States v. Hernandez*,
   No. 1:03-cr-01257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005)..............................33
*United States v. Husein*,
   478 F.3d 318 (6th Cir. 2007)................................................................................................28
*United States v. K*,
   160 F. Supp. 2d 421 (E.D.N.Y. 2001)..................................................................................26
*United States v. Maier*,
   975 F.2d 944 (2d Cir. 1992)..................................................................................................26
*United States v. Martin*,
   520 F.3d 87 (1st Cir. 2008) ..................................................................................................28
*United States v. McCormick*,
   No. 3:15-cr-00009-1, 2017 WL 492506 (M.D. Tenn. Feb. 7, 2017) ....................................24
*United States v. Nelson*,
   724 F. App'x 814 (11th Cir. 2018)......................................................................................34
*United States v. Pauley*,
   511 F.3d 468 (4th Cir. 2007)................................................................................................29
*United States v. Rutherford*,
   323 F. Supp. 2d 911 (E.D. Wis. 2004)................................................................................26
*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)..................................................................................................29
*United States v. Vigil*,
   476 F. Supp. 2d 1231 (D.N.M. 2007) ..................................................................................29
*United States v. Williams*,
   662 F. App'x 366 (6th Cir. 2016)........................................................................................32
*United States v. Wunder*,
   No. 5:09-cr-40052 (RDR), 2010 WL 654754 (D. Kan. Feb. 23, 2010)..................................26

**Statutes**

18 U.S.C. § 3553(a) ........................................................................................................... passim

**Other Authorities**

*Deterrence in the Twenty-First Century*,
   42 CRIME & JUST. 199 (2013) ............................................................................................33

## PRELIMINARY STATEMENT

Because of the intervention by the victims of Nxivm and DOS, law enforcement, and this Court, in the last three years Allison Mack has turned her life around and earnestly dedicated herself to rehabilitation, renunciation of Keith Raniere and those who supported him, and making amends.  She is now well on her way to once again being a productive member of society.  Since being freed from the twisting influence of Raniere, Ms. Mack has re-devoted herself to pursuing a positive and constructive life, centered around the three pillars of family, education, and healing.

The primary, and most important, factor in her rehabilitation has been her family.  Where once Raniere commanded Ms. Mack's complete devotion and fealty to the exclusion of all others, Ms. Mack has now reintegrated into the life of her family, seeking out and offering support in a way that would have been unthinkable three years ago.  Ms. Mack has recognized that if she is ever to fully return to herself, her family has an integral role to play, and she has turned those sentiments into action.

Ms. Mack has also pursued an academic path previously set aside in service of her acting career, by obtaining an associate's degree at a community college in California, graduating with a 4.0 grade point average.  As her professors describe, Ms. Mack has been a model student who not only excels personally but elevates the students around her.  And Ms. Mack recently enrolled in a bachelor's degree program at the University of California, Berkeley to continue her studies.  At the same time, she has been working as a caterer (pandemic and other restrictions permitting), and in the future looks towards continuing her education to become a contributing member of society.  Ms. Mack has undertaken these pursuits because, here too, she recognizes that education and work are necessary to her ongoing recovery under the supervision of this Court.

Ms. Mack's rehabilitation has also been aided and guided by her ████████   Indeed, since her arrest, Ms. Mack has committed ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Ms. Mack has come to recognize the pain her actions have caused and she has learned how to channel her remorse and grief into positive actions—most notably her reinforced devotion to family and education. ████████████████████████████

████████████████████████████████████████████

None of these things can justify Ms. Mack's past actions, or erase the harm done to the victims.  Ms. Mack will justifiably live with the resulting scorn and guilt for the rest of her life. However, having been finally removed from Raniere's grip by these very proceedings and the unwavering support of her family and friends that they have engendered, Ms. Mack has regained the clarity she had lost as a member of Nxivm—clarity to see past Raniere's lies and manipulations, and to understand the incalculable harm caused by the group she was a part of.  That is why she pled guilty and worked to assist the Government in its prosecution of Raniere and others, and it is why she will appear before the Court for sentencing at peace with whatever sentence the Court imposes to atone for the wrongs in which she participated.

The Nxivm saga and the story of Ms. Mack's descent have been a tragedy for all involved. But that need not, and should not, be the end of the story for Allison Mack.  Her acceptance of responsibility, and the strides that Ms. Mack has made since her arrest, provide evidence that, from this point forward, the world can be a better place for having her in it.  Ms. Mack therefore respectfully asks the Court to permit her to continue down this path of growth and reform by imposing a sentence without incarceration, and which would permit her to continue her academic studies.

## FACTUAL BACKGROUND

This submission proceeds in two parts.  The first is a recitation of Ms. Mack's personal history and characteristics, from her childhood years and formative experiences, through her involvement with Raniere, Nxivm and DOS, the realization that she had badly lost her way, and her subsequent efforts at rehabilitation and atonement.  Following that will be a discussion applying the 18 U.S.C. § 3553(a) factors to the facts of this case.

### I.   Life Before Nxivm

Allison Christine Mack was born on July 29, 1982 in Preetz, Germany, to her parents Jonathan and Melinda.  Ms. Mack's father, now 72, was a professional opera singer who is now retired and collects Social Security income.  Her mother, age 69, was a schoolteacher and a bookkeeper for a talent agency.  Ms. Mack has a brother, ███████, who is one year her senior, and a sister, █████, who was born when Ms. Mack was eight years old.

Allison Mack's childhood began uneventfully.  As recounted in the PSR, her material needs were generally met, and her family was "tight-knit," frequently going camping or taking trips in connection with her father's work as an opera singer.  PSR ¶ 206.  At the age of four, however, this trajectory changed when Ms. Mack's mother began to involve Ms. Mack in the child acting and modeling industry.  ██████ Mack Ltr. (Ex. 2) at 1.  It is no secret that the life of a child performer can involve experiences, and create stresses, that impact development.  *See, e.g.*, Wanda Behrens-Horrell L.C.S.W., N.C.P, *The Child Performer*, Psychology Today, Jun. 22, 2011, *available at* https://www.psychologytoday.com/us/blog/in-the-trenches/201106/the-child-performer (observing that "young actors must constantly cope with rejection, jealousy, self-scrutiny, obsessive thoughts, and the nonstop need to be perfect."). ██████████

███████████████████████████████████████

██████████████████████████



Around the same time Ms. Mack began acting



*Id.*; *see also* PSR ¶ 207.

At the age of 15, Ms. Mack booked her first television show as an actor. ▮ Mack

Ltr. (Ex. 2) at 1.  At that time, Ms. Mack ended her progression through the ordinary avenues of

education, instead taking "independent study" classes designed for children in show business.  *Id.*

In 2001, around the same time she earned a high school diploma through the independent study

program, Ms. Mack was cast in the television show, *Smallville*, based on the Superman character

from DC Comics.  *Id.*

The *Smallville* program was shot in Vancouver, Canada, and as a result Ms. Mack left

home and moved to live full-time in a new city in a different country, all at the age of 18. ▮

Mack Ltr. (Ex. 4) at 1.  *Smallville* would go on to become a successful television show, running

for ten seasons.  During this time, Ms. Mack saw her family only intermittently, mostly at holidays.

▮ Mack Ltr. (Ex. 4) at 1.  As a result, she and her family grew apart.  *Id.*  Still, Ms. Mack

made attempts to keep in touch, and was generous with the money that resulted from her role on

*Smallville*.  For example, during this time Ms. Mack paid half of the tuition for her brother to complete ███████████████████████████████████████████████ Mack Ltr. (Ex. 4) at 1-2.  ███████████████████████████████████████████ *Id.* Likewise, Ms. Mack's sister recalls that, even though Ms. Mack was often not physically present with the family, she would regularly check in on her sister by text message and would send gifts between visits.  ███ Mack Ltr. (Ex. 5) at 1.  Ms. Mack also paid the tuition for ████████ ███████████████████████████████████ Mack Ltr. (Ex. 5) at 2.  And Ms. Mack did make efforts to participate in family life when the filming schedule permitted. ███ Mack fondly recalls a surprise visit by Ms. Mack one Mother's Day when she called her mother saying that she was in London but wished her mother a happy holiday—and then Ms. Mack appeared unexpectedly, holding her cell phone, a few yards away.  ███ Mack Ltr. (Ex. 5) at 1.

Despite the material and professional success that Ms. Mack had achieved in her acting career, Ms. Mack was plagued by feelings of hollowness and a lack of purpose.  As Ms. Mack's ███ explains it, ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ Mack Ltr. (Ex. 2) at 2.

## II.   Involvement in Nxivm & DOS

In 2007—five years into the run of *Smallville*—Ms. Mack first attended a self-help stylized workshop of the organization then known as ESP, or "Executive Success Programs," which would subsequently become part of an umbrella organization called Nxivm  As Ms. Mack would learn later, this organization actually had all of the characteristics of a multilevel marketing scheme (PSR ¶ 9) and had been founded in the late 1990s by Raniere, who had previously run, and closed, another multilevel marketing company under allegations of fraud.  PSR ¶¶ 6, 9.  The company

billed itself as providing "coaching" for members to attain a "new ethical understanding" to allow humanity to "rise to its noble possibility." PSR ¶ 6.

Ms. Mack was immediately enthusiastic about the program. In fact, Ms. Mack prevailed upon her mother to attend a Nxivm program with her soon after Ms. Mack became aware of the group. ▮▮▮ Mack Ltr. (Ex. 2) at 2. Ms. Mack's friends recall that she was "excited about the opportunity for personal and professional growth offered by the program" and "was looking forward to empowering other young women and helping them find the same strength they were discovering." ▮▮▮ Ltr. (Ex. 6) at 1. Ms. Mack's family members also easily recall Ms. Mack's beginnings with the program, remembering that "Allison was tremendously excited about this new self-development course she had taken with this brilliant man, Keith Raniere." ▮▮▮ Mack Ltr. (Ex. 4) at 2. Indeed, even during Ms. Mack's early involvement with Nxivm, Raniere had set himself up as the "spiritual founder" of the organization and its philosophy. PSR ¶ 6.

In Ms. Mack's early years with Nxivm, the programs she paid to attend appeared to have some initial, positive impact. As recounted by her brother:



▮▮▮ Mack Ltr. (Ex. 4) at 2.

Following the end of *Smallville* in 2011, Ms. Mack moved to New York City to pursue additional acting roles in theater. ▮▮▮ Mack Ltr. (Ex. 2) at 2. She also continued to attend additional Nxivm seminars and programs, occasionally traveling to Albany, where Raniere lived. *Id.* In 2012, Ms. Mack was presented with a choice: pursue an application to Yale Drama School or move to Albany to be closer to Nxivm and its leader, Raniere. Fatefully, and unfortunately, she chose the latter. At the outset, Ms. Mack's decision to associate more deeply with Nxivm seemed

to be a positive and rewarding experience.  As her longtime friend, ██████████ describes it "[o]nce she was in Albany, she told me about the classes she was running and the women she was working with. Allison was proud of the impact she was having on the women around her. I was proud of her for following what I believed was a healthy and meaningful path in her life." ██████ Ltr. (Ex. 6) at 1.  According to Ms. Mack's mother, "[w]hen people in the [Nxivm] community learned that I was her mother they would joyfully exclaim that they loved Allison!  She had been there for them with kindness and patience in their moments of crisis and confusion." ██████ Mack Ltr. (Ex. 2) at 2.

However, Ms. Mack's family soon began to see troubling changes.  As related by her brother, ██████ Mack, by 2013, Ms. Mack appeared physically depleted by her lifestyle in Nxivm. ██████ Mack Ltr. (Ex. 4) at 2.  This only became more pronounced as time went on. Ms. Mack's mother recalls having concerns about Nxivm after Ms. Mack moved to Albany:

> I was concerned about the level of commitment the Nxivm community expected of her.  They were all expected to report their activities, goals, weight and diet to select members of the community, including their successes and failures in these areas.  Punishments and rewards were given based on performance.  The community's expectations and demands caused Allison to be sleep deprived.  She survived on 3-4 hours of sleep per night.

Ms. Mack's brother similarly recalled that Nxivm seemed to be taking a sinister turn:

> In 2016, she came to our house for Thanksgiving dinner claiming that she was on day 7 of a ten day cleanse and ate absolutely nothing.  She was almost in a daze the whole time.  She would often absent herself to have a phone or video call with her "people" in New York.  While she acted caring and loving, it was clear that she was in an unhealthy situation that was taking a toll on her.

██████ Mack Ltr. (Ex. 4) at 3.

By 2016, there was a very specific reason for Ms. Mack's deteriorating condition.  The prior year, Raniere had created an organization called "Dominus Obsequious Sororium," or DOS

for short, which is bastardized Latin intended to mean "Master of the Obedient Female Companions."  PSR ¶ 12.  DOS was comprised of female members, except for Raniere (whose involvement was to remain secret from Nxivm and anyone outside of the original group of DOS members he recruited), who constructed the organization to his own specifications to create modern-day harem for himself.  The system created by Raniere set up so-called "masters" and so-called "slaves" recruited to join the organization.  Prior to Ms. Mack's involvement with DOS,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

*See* PSR ¶ 207.

At its conception, Ms. Mack (wrongly) understood DOS to be an organization designed to empower women.  As more people became involved in DOS, however, Raniere's demands and directives to his "slaves" increased and became depraved and sadistic.  One of those directives was for initiates to provide an ever-increasing amount of "collateral" to DOS, in the form of compromising photos, videos, or written confessions (both true and false) of damaging facts.  This "collateral" was meant to demonstrate an initiate's commitment to the organization.  Ms. Mack herself was compelled to provide collateral to Raniere, thus handing Raniere a cudgel that could be wielded to keep her in line.  PSR ¶ 62.  Upon Ms. Mack's delivery of collateral, Raniere had thus obtained control over Ms. Mack, and used that control to impose his will on her and others in DOS.  Ms. Mack's condition as a member of DOS was described in the trial testimony of Mark Vicente, a former member of Nxivm turned whistleblower:

> **Q:**  Was there anybody in particular who looked exceedingly skinny?
>
> **A:**  My -- my greatest concern back then was Allison Mack.  I was very concerned. I -- I think at the time -- yes, I was spending a lot of time with her back then, and I just couldn't understand why she was -- her weight was -- was dropping so much.  And also accompanying the weight loss was sort of this tired, kind of out-of-it look.  You know, she sometimes

couldn't focus very well.  And to me it looked like a kind of malnutrition.
So I was deeply concerned about that, and so I went to talk about Raniere
about it.

[ . . . ]

**Q:**  So you discussed -- you had a discussion with the defendant.  What
did he say?

**A:**  Well, I went to see him.  I think he was at that point living at 21 Oregon
Trail.  I went to see him, and I said, I'm concerned that all these people
have this idea that skinniness is the ultimate objective.  And I said to him,
it also worries me deeply given that in this society right now, with – with
the -- the obsession, with the bodies and models and everything, like I
don't think it's healthy to tell a woman that their -- her weight is tied to
her enlightenment or her growth or whatever.  It's just unhealthy.  It's
going to --it – it's bad.  Women, and especially young women have enough
issues already with their appearance given the culture we live in, why --
why do that?  And he said to me, well, you know, I work with different
people in different ways, and there's different reasons for different things.
And I – you know, it wasn't making any sense whatsoever.  And I said,
But Allison -- you know, what about Allison?  She's -- you know, she
looks terrible. This is -- if this -- if this is her having some kind of
breakthrough, I don't what's going on.   Then I don't understand
breakthroughs because she looks horrible.  And he said -- I said to you,
you know, she looks broken. **And he said, well, I'm trying to break her.**

Raniere Trial Tr. 824-26 (emphasis added).

Raniere succeeded in breaking Allison Mack.  As explained by ███████████



███████ Ltr. (Ex. 7) at 3.

Her brainwashing complete, Ms. Mack acquiesced in Raniere's sick fantasies and, to her unending regret, became a "master" as well as Raniere's "slave."  The fact that Raniere was able to turn Ms. Mack into an agent of trauma is appalling, but consistent with the structure and function of cults like Nxivm.  As the Government's expert, Dr. Hughes, explained at Raniere's trial, indoctrination by an abuser "continues to sort of chop away and diminish an individual's own sense of their independence, own sense of their individual capacity, their sense of their own autonomy and freedom of thought."  Raniere Trial Tr. 3723.  The cumulative effect of these experiences is to put an abuse victim in constant fear and under the control of the indoctrinator.  As Dr. Hughes also explained, the pattern of abuse by somebody like Raniere "creates the sense of the omnipotence, the omnipresence of the perpetrator, that it crosses time and space barriers, that they are wherever you are."  Raniere Trial Tr. 3724-25.

In pleading guilty in this matter, Ms. Mack acknowledged the wrongs and trauma inflicted on Jane Does 5 and 8 which resulted from her involvement with Raniere, whether through Nxivm, DOS, or both.  The activities that Ms. Mack was involved in are set forth at length in the PSR and the Government's sentencing submission (ECF No. 1045), they were described at the trial of Raniere; Ms. Mack does not dispute or reprise them here.[1]  Now that the blinders of the Nxivm cult have been removed, Ms. Mack recognizes that her actions were abhorrent.  The Allison Mack of today barely recognizes who she was during those dark times.

## III.   Aftermath of Ms. Mack's April 2018 Arrest

In 2017, the Federal Bureau of Investigation began investigating Raniere and Nxivm more broadly.  PSR ¶ 5.  In October 2017, an expose in the *New York Times* revealed the existence of

---

[1] The PSR describes the aspects of Nxivm and DOS in which Ms. Mack was involved.  The PSR does not suggest Ms. Mack was involved in certain uniquely troubling parts of Nxivm—such as Raniere's associations with underage girls and the use of the court system to harass Nxivm opponents and whistleblowers.

11

DOS, and Raniere, spooked by the media attention, relocated to Mexico.  PSR ¶ 103.  In February 2018, a sealed arrest warrant was issued for Raniere and, subsequently, he was arrested in Mexico on March 26, 2018 and extradited to the United States.  PSR ¶ 108.  On April 20, 2018, Allison Mack was arrested at her home in Brooklyn, New York.  PSR ¶ 109.  Ms. Mack now understands that this was the best thing that could have happened to her at that time.

### A.  Acceptance of Responsibility and Denouncement of Nxivm/DOS

Under the bail conditions ordered by this Court, Ms. Mack was finally separated from Raniere and the Nxivm community.  Instead of continuing her blind adherence to Raniere and the organization he created, Ms. Mack's arrest wrested her away from his (and their) influence and reunited her with her family.  The Government's insistence that Ms. Mack reside with her family, and the Court's endorsement and reaffirmance of that requirement, proved to be both beneficial and prescient.  As a result, Ms. Mack has been subject to home confinement at her parents' house for more than three years.  ECF No. 24.  It is not an overstatement that the intervention of victims, law enforcement and the Court likely saved Ms. Mack's life by leaving her no choice but to reintegrate into her family.  Beyond the direct reach of Raniere or those who continued to support him, Ms. Mack slowly but surely began to think for herself again and to understand and internalize the sinister nature of the man she had trusted and the group she had committed to.  ████ Mack Ltr. (Ex. 1) at 9.

Ms. Mack recognizes that her subsequent cooperation with the Government could have been even more substantial had it started sooner.  *See* ECF No. 1045 at p. 6.  To be sure, Ms. Mack's turnaround was not instantaneous.  For several months following her arrest, Ms. Mack remained in denial about the nature of Nxivm, DOS, and the intentions of Raniere, to whom she had been utterly devoted for more than 10 years.  ████ Mack Ltr. (Ex. 2) at 3.  During Ms. Mack's time inside Nxivm, Raniere had frequently warned Ms. Mack that society would unjustly

penalize them for living unconventional, but legal, lives. ██████ Mack Ltr. (Ex. 1) at 8.  Viewed

through the lens of those warnings, Ms. Mack felt that the charges were a big "misunderstanding,"

because, "in her mind she was following Keith's guidance in helping herself and other women to

conquer their attachments and limitations." ██████ Mack Ltr. (Ex. 2) at 3. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Eventually, that realization did come.  Deeply devastated by the realization that she had harmed,

rather than helped, several women she cared about, ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

        ████████████████████████████████████████████
        ████████████████████████████████████████████
        ████████████████████████████████████████████
        ████████████████████████████████████████████



█████ Ltr. (Ex. 3) at 2.

█████ Ltr. (Ex. 3) at 3.  Ms. Mack's brother, █████ Mack, also saw Ms. Mack come to the recognition that Raniere had been a false prophet who was leading her astray:

█████ Mack Ltr. (Ex. 4) at 3.

Freed from Raniere's influence, and with the help of █████, family, and attorneys, Ms. Mack was finally able to admit to the crimes she had committed.  █████ Mack Ltr. (Ex. 1) at 9-10.

### B.  Decision to Plead and Cooperate Against Raniere

On March 13, 2019, the Government superseded its Indictment for a second time, charging Mr. Raniere with Sexual Exploitation of a Child and Possession of Child Pornography.  ECF No.

430. These new charges, coupled with other information Ms. Mack found out through the discovery in this case, cemented Ms. Mack's emerging recognition of Raniere's evil intentions and the extent to which she had been deceived and complicit in a criminal enterprise. Accepting the evil of what she was a part of, Ms. Mack shifted her focus to "process[ing] [her] shame and remorse" and "mov[ing] into [her] future with integrity" ███████ Mack Ltr. (Ex. 1) at 9), which included taking responsibility for her behavior before this Court and doing whatever she could to ensure that Raniere would never hurt anybody again.

To that end, on April 8, 2019, Ms. Mack pleaded guilty pursuant to a cooperation plea agreement with the government. At her change of plea hearing, following her allocution, Ms. Mack made the following statement expressing her remorse for what she had done:

> I am very sorry for the victims of this case. I am also very sorry for the harm that I caused to my family. They are good people who I have hurt through my misguided adherence to Keith Raniere's teachings. I apologize to them from the bottom of my heart, and I am truly very sorry for what I have done.

April 8, 2019 Hr'g Tr. 25:12-17.

Ms. Mack not only pleaded guilty but cooperated with the Government in its effort to bring Raniere and others to justice. The initial stages of Ms. Mack's cooperation proceeded in fits and starts, as Ms. Mack was working through some of the psychological trauma of the past decade in real time during her proffer sessions with the Government. Notwithstanding the emotional difficulty of this process, between the end of March 2019 and the end of Raniere's trial in July 2019, Ms. Mack met with the Government for several multi-hour proffer sessions at which she described in wrenching detail her experiences with Raniere, including on the following topics:

███████████████████████████████████████████
███████████████████████████████████████

15



During these repeated, lengthy proffer sessions, Ms. Mack told the Government everything she knew about Raniere, his co-conspirators, and the organization he had created. To participate in these sessions, Ms. Mack made multiple cross-country flights, and was prepared to make more, as she remained on standby to testify at Raniere's trial, which she was ready and willing to do.

Ultimately, Ms. Mack was not called as a witness during Raniere's mid-2019 trial. Nevertheless, Ms. Mack respectfully submits that her cooperation reflects her best efforts at the time, given the physical and emotional difficulties she was experiencing after more than a decade as an acolyte of Raniere inside Nxivm. Indeed, even though Ms. Mack was not called to testify, her cooperation with the Government was critical to the prosecution of Raniere and his co-conspirators. The Government's § 5K1.1 letter confirms as much, noting that Ms. Mack provided the Government with "relevant emails, documents and recordings." *See* ECF No. 1045 at 5. It was only through her cooperation that the Government obtained access to a particularly significant recording of Raniere discussing the branding of DOS "slaves." *Id.* at pp. 5-6. The centrality of this evidence is confirmed by the fact that the Government referenced it in *both* the opening *and* closing arguments at Raniere's trial. *Id.* at 6. As the Government's § 5K1.1 letter makes clear, "[t]he government was not previously in possession of this recording." *Id.* The Government's §

16

5K1.1 letter also recognizes that Ms. Mack's cooperation also aided in the prosecution of Raniere's

co-conspirators, observing that "it is highly likely that the fact of her public guilty plea was a factor

in other defendants' decisions to plead guilty." *Id.* at p. 7.

### C. Efforts to Rehabilitate and Make Amends

The Allison Mack of today does not recognize the Allison Mack of three years ago. In the

more than three years she has been under Court supervision, Ms. Mack's life has turned completely

around from depravity and trauma to peace, acceptance, and remorse. The three foundations of

that turnaround have been therapy, education, and her family.

#### 1. Ms. Mack's Reunification with Her Family

As described above, Ms. Mack subjected her family to untold stress and worry during her

time in Nxivm, and Ms. Mack witnessed the pain and fear inflicted on them by the withering media

attention after the Nxivm story became public. It would have been completely understandable if

they wanted nothing to do with her, given the horrors they suffered as a result of her conduct. But

they did not turn their backs on Ms. Mack, and the support they have provided is an act of grace

for which Ms. Mack will be eternally grateful. Indeed, it is no stretch to say that without her

family, Ms. Mack likely would not have survived the last three years.

17



The importance of this relationship repair has also been apparent to Ms. Mack's friends, including her longtime friend, ███████████, who writes that "[t]he strongest and most consistent of Allison's feelings have been for her family [ . . . ] [s]he marvels at the unwavering support and love they have given her despite everything she has put them through." ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Ms. Mack's friend, ███████████, has also witnessed the marked shift in Ms. Mack's attitude towards, and appreciation for, her family:

> It is astounding to watch her introspective process and she has trudged headlong into unraveling all the parts of her journey. This process has been painful for her and she continues to fight for authenticity and accountability. In this process of growth, I have seen her extend grace to her siblings and parents in ways that she would not have done in the past."

████████████ Ltr. (Ex. 8) at 1.

Ms. Mack's reunification into her family unit has not only been positive for Ms. Mack herself, but also for her family members. Ms. Mack's younger sister attests that she "often reflect[s] on [Allison's] arrest as a blessing in disguise: never in my life have I felt so deeply immersed in sisterhood as I do now." ████ Mack Ltr. (Ex. 5) at 2. Ms. Mack's older brother similarly described the incredible relief he felt at having his sister back: "Looking at it now, I feel like Allison's twelve years in NXIVM were almost a bad dream. She had become completely lost in that organization and it had swallowed her whole life." ████ Mack Ltr. (Ex. 4) at 4. Thanks to the Government and the Court, Ms. Mack has had an opportunity to wake up from that bad dream and begin the work of making amends to her family, friends, and those hurt by Nxivm.

18

## 2. Ms. Mack's Commitment to Education

As part of her change of direction, Ms. Mack has also embarked on new courses of education—a pursuit that she had previously set aside in service of her career as an actor. As set forth in the PSR (¶ 219) and the letters of support provided to the Court, since her arrest Ms, Mack has diligently sought to "make up for lost time" in her educational development by obtaining an associate's degree from a community college in California, and is now working towards her bachelor's degree at the University of California, Berkeley.

Ms. Mack's passion for learning is evident, and she graduated from community college with a perfect 4.0 grade point average. As recounted by one of her professors, "[b]ecause she once gave up formal education, she is now visibly thirsty for knowledge, working to make up for everything that she might have missed." ▮ Ltr. (Ex. 9) at 2. Another professor attests that "Ms. Mack is one of the most intelligent, insightful and authentic learners that I have worked with in my 25 year career as a ▮ Ltr. (Ex. 10) at 1. Professor ▮ goes on to note that "Ms. Mack is deeply engaged in the process of discovering who she was, who she is and who she is becoming as a person, daughter, sister, aunt and as a member of the larger community and society with a positive and meaningful role to play." ▮ Ltr. (Ex. 10) at 2. Ms. Mack has found the outlet of education to be deeply fulfilling, and wishes to stay the course in her pursuit of education and to learn skills that can benefit others.

### 3. Ms. Mack's Commitment to ██████



██████████████, Ms. Mack has completely changed course and recognized that she must acknowledge the damage she has caused and embrace accountability. In the words of one of Ms. Mack's friends, she has been participating in "fierce and honest conversations" in which she has learned to "take herself on." ████████ Ltr. (Ex. 11) at 1. Another friend describes the situation in this way:

20

████████████████████████████████████

████████████████

Another of Ms. Mack's friends has also witnessed Ms. Mack's change from denial into grief:

> She has fought tenaciously for all of this. I have watched her sit in the sorrow and experience the waves of pain over all the things she cannot change. I have held her hand as she has wept in remorse, realizing her disillusionment with Keith and all that she participated in.

████ Ltr. (Ex. 8) at 2.

Those close to her have seen these events as nothing short of a "transformation" by which Ms. Mack is "owning, as best she knew how, what she had been a part of." ████████ Ltr. (Ex. 11) at 1. Ms. Mack's sister describes Ms. Mack having "a deep sense of shame in her heart" yet remaining "utterly direct about the mistakes she has made, and the damaging consequences." ████ Mack Ltr. (Ex. 5) at 3.

The contrast between the Ms. Mack of three years ago and Ms. Mack today is striking, with friends having "witnessed Allison in dissonance and confusion—not knowing how someone she trusted could be someone evil—to being able to own how she was deceived." ████████ Ltr. (Ex. 11) at 1. Put differently, Ms. Mack's friends and loved ones have "watched her step out of one life and into a new one." *Id*. ████████████████████████████ Ms. Mack to truly see what she was a part of, and has given her the wherewithal to begin the process of trying to make amends.

### 4. Ms. Mack's Divorce from Nicki Clyne

In December 2020, as part of her continuing efforts to right her wrongs, Ms. Mack filed for divorce from longtime Nxivm and DOS member Nicki Clyne, whom she married at Raniere's request in order to obtain a favorable immigration status for Ms. Clyne. PSR ¶ 210. The marriage

21

represents another example of the now-incomprehensible lack of judgment Ms. Mack displayed during her time in DOS, and another action about which she is deeply remorseful.  In addition to rectifying the fraud, Ms. Mack felt strongly about severing ties with Ms. Clyne because of Ms. Clyne's continued outspoken support for Mr. Raniere, who Ms. Mack whole-heartedly rejects.  *Id.*



*          *          *

For more than a decade, Ms. Mack put her trust in a depraved manipulator, and let herself be indoctrinated.  Ms. Mack knows that she has committed grave wrongs as part of her association with Raniere.  She will be forever remorseful for her failings during that dark time.  However, as set forth above, the arc of Ms. Mack's life is now trending in a positive direction, towards truth, healing, education, and family.  As a result, we respectfully submit that the Allison Mack standing before the Court at her sentencing hearing should receive a sentence that accounts for the progress she has made in charting this new path.

## APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

As the Court knows, the Sentencing Guidelines are no longer mandatory and are not even presumed to be reasonable; they are just one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006). The Court must conduct its own evaluation of the § 3553(a) factors and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

This is an unusual and atypical case where the perpetrator of the crime is also a victim of those very same crimes and thus does not fit comfortably within the ordinary scope of the Guidelines. "Atypical cases were not adequately taken into consideration" by the Guidelines, and as a result "factors that may make a case atypical provide potential bases for departure." *Koon v. United States*, 518 U.S. 81, 94 (1996). Nevertheless, the overarching provision of § 3553(a) is the same in extraordinary cases as it is elsewhere: to impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing established by Congress. Adherence to this principle means that if a sentence other than imprisonment would be sufficient to meet those goals, then the Court *must* impose such an alternative. After considering and applying the relevant § 3553(a) factors which are discussed further below, Ms. Mack respectfully submits that a sentence should be imposed which does not require incarceration.

I.    **The History and Characteristics of the Defendant and the Nature of the Offense (§ 3553(a)(1))**

   A.  **The Nature and Circumstances of the Offense**

Ms. Mack recognizes that her actions were abhorrent and inflicted pain and trauma on many others. She pleaded guilty to take accountability for those actions, and she does not attempt

23

to justify or legitimize them here.  The law requires that, in fashioning an appropriate sentence, courts should "attempt[] to understand (as best one can) what set a defendant upon [an] illegal course." *United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000).  Here, we respectfully submit that the Court's analysis should take into account that, in addition to being a wrongdoer, Ms. Mack was herself a "slave" in the thrall of Raniere and who had herself been compelled to provide Raniere with "collateral" and was subjected to prolonged abuse by Raniere.  *See* PSR ¶ 62.  While this does not excuse Ms. Mack's conduct as a moral matter, as a legal matter Section 3553(a) makes that context relevant in determining her sentence.  *See, e.g.*, *United States v. McCormick*, No. 3:15-cr-00009-1, 2017 WL 492506 at *10 (M.D. Tenn. Feb. 7, 2017) ("The context in which the offense took place indicate [defendant] was unusually influenced by a number of factors, including untreated mental health issues (depression, anxiety, and a 'maladaptive' desire to please) . . ., and other issues. While these circumstances do not excuse [defendant's] conduct, they do help to explain it").  The Government has likewise acknowledged Raniere's leading role in the events described at trial and in Ms. Mack's PSR.  *See* ECF No. 1045 at 2 (noting that the branding of DOS members was done "[a]s directed by Raniere").

As the Court observed at Raniere's sentencing, at bottom this entire saga resulted from Raniere's skillful manipulation of others, including Ms. Mack.  *See* Raniere Sentencing Hr'g Tr. 123 ("You don't have to be the smartest man in the world to manipulate and to harm other people. And that is really what we are talking about here.  What did he do?  What did he do to hurt people and violate the law in the process?  That is really what we are here for.").  Raniere's years-long indoctrination of Nxivm members eroded the ability of his victims, including Ms. Mack, to exercise their better judgment to remove themselves from the toxic situation and seek help for those still enmeshed in it.  Indeed, even though—as set forth above—Ms. Mack's association with

24

Nxivm began innocently and stemmed from a good faith desire to help others and herself, she did not extricate herself from the cult when it took a darker turn.  *See* Raniere Sentencing Hr'g Tr.127 (noting that Raniere knew "how to keep people from leaving, that's his skill.").  Thus, even though her mind was twisted by Raniere, Ms. Mack acknowledges that she is responsible for engaging in serious criminal conduct.

### B.  An Individualized Assessment of Ms. Mack's Personal Characteristics Warrants a Mitigated Sentence

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant."  This ensures "that the punishment will suit not merely the offense but the individual defendant."  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted).  Just as it is necessary for the Court to understand "what set a defendant upon [an] illegal course," *Blake*, 89 F. Supp. 2d at 332, "a court's duty is always to sentence the defendant as [s]he stands before the court on the day of sentencing."  *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam)).  Put differently, courts should utilize the "most up-to-date picture" of a defendant's "history and characteristics."  *Pepper*, 562 U.S. at 492.

For example, in *Pepper*, a defendant was convicted of narcotics trafficking, sentenced, and later resentenced as a result of other proceedings.  By the time of his resentencing, the defendant "had been drug free for nearly five years, had attended college and achieved high grades, was a top employee at his job slated for a promotion, had reestablished a relationship with his father, and was married and supporting his wife's daughter."  *Pepper*, 562 U.S. at 492.  The Supreme Court emphasized that the District Court should have applied the § 3553(a) factors to the man standing before it on resentencing, rather than ending the analysis of his "history and characteristics" at the time of the first sentencing.  *Id.*; *United States v. Gonzales*, 163 F. Supp. 3d 1078, 1126 (D.N.M.),

25

*aff'd*, 844 F.3d 929 (10th Cir. 2016) ("a court may consider 'post offense rehabilitative efforts' in deciding whether to grant" a variance); *United States v. Rutherford*, 323 F. Supp. 2d 911, 914 (E.D. Wis. 2004) (same).

Consistent with this principle, "this circuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any presentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation." *United States v. K*, 160 F. Supp. 2d 421, 442 (E.D.N.Y. 2001); *see also United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992).

Here, as described above, Ms. Mack's rehabilitative efforts since her arrest have been nothing short of extraordinary.  With some forced distance between herself and Raniere, she has come to the hard-won realization that her decade-plus in Nxivm was a grievous mistake that will haunt her for the rest of her life.  However, Ms. Mack has not succumbed to self-pity as a result of this realization, but rather has taken numerous, concerted, and consistent steps towards bettering herself, repairing the relationships she destroyed, and making amends to those who she hurt.  She has subjected herself to difficult and invasive psychotherapy to unpack the trauma she suffered, and inflicted, in an attempt to create a foundation on which to build a new life.  She has turned to education—a pursuit she previously neglected—as an outlet and as a source of new skills and knowledge that she wishes to use to help others, not harm them.

And, perhaps most importantly, she has recommitted to family and apologized profusely for the harm and distress she caused.  *Cf. United States v. Wunder*, No. 5:09-cr-40052 (RDR), 2010 WL 654754, at *4 (D. Kan. Feb. 23, 2010) ("While some criminals are themselves a negative influence upon their families, that is not the case here.").  This group stands ready to support Ms. Mack during any period of probation, which in and of itself supports a variant sentence.  *United*

26

*States v. Harding*, No. 05-cr-1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. 2006) (awarding non-Guidelines sentence, noting "the significant network" ready to support defendant).

In addition, we respectfully submit that Ms. Mack's acceptance of responsibility for her crimes are likewise relevant to the § 3553(a) analysis of her nature and characteristics. When she was arrested, Ms. Mack was a shell of a human being, having been unable to see beyond Nxivm for several years. It naturally took time for Ms. Mack's psyche to adapt and come around to the truth that, for more than a decade, she had been following a false prophet who had abused dozens of women and, indeed, had abused her. Although it took time for her to adjust to this new reality, once she regained clarity and realized the fact and magnitude of the wrong, Ms. Mack made good faith attempts at cooperation and to aid the Government in its prosecution of Raniere.

And that cooperation was meaningful. As recounted in the Government's § 5K1.1 letter (ECF No. 1045) Ms. Mack flew to New York from California participate in numerous "lengthy" proffer sessions, turned over relevant documents, and was the source of a critically important recording of Raniere discussing the branding of DOS members. ECF No. 1045 at 5-6. That piece of evidence was so central to the Government's case that it was used by prosecutors in both the opening and closing statements of Raniere's trial. Without Ms. Mack's cooperation, that crucial evidence would likely not have come to light. *Id.* at 6. Moreover, although not as quickly as anybody would have hoped, Ms. Mack did, eventually, come to see the criminality she had become a part of, and pleaded guilty herself. The Government's § 5K1.1 letter also recognizes that "it is highly likely that the fact of her public guilty plea was a factor in other defendants' decisions to plead guilty," thereby sparing the Government, the Court, the victims, and the witnesses the prospect of several additional trials. *Id.* at 7.

We respectfully submit that each of these facts—Ms. Mack's acceptance of responsibility, cooperation, and commitment to family, education, and therapy—supports the imposition of a mitigated sentence. *See, e.g., United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation"); *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007) (affirming sentence of one-day credited for time served and three years supervised release, including 270 days of home confinement, despite an advisory Guidelines range of 37 to 46 months, where the court noted that defendant's "family is going to benefit more by your presence than society is going to benefit from your incarceration"); *cf. United States v. Chapman*, 356 F.3d 843, 847 (8th Cir. 2004) (reversing district court's denial of downward departure for post-offense rehabilitation, holding that "truly exceptional rehabilitation alone can, in rare cases, support a downward departure even when the defendant does not accept responsibility").[2]

## II.     Respect for the Law and Just Punishment (§ 3553(a)(2)(A))

We also respectfully submit that a mitigated sentence is consistent with promoting the respect for law and the imposition of a just punishment. Ms. Mack—whose judgment was clouded for so long by her association with Raniere—has come to understand and acknowledge that her actions broke the law and were morally abhorrent. That is why she pled guilty and worked with the Government to aid in the prosecution of Raniere. However, we respectfully submit that a

---

[2] We also note that Ms. Mack had no criminal history prior to her indoctrination by Raniere. This further supports the imposition of a mitigated sentence. See *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (because "Criminal History Level I did not fully account for [defendant's] complete lack of criminal history, considering it as a mitigating factor was not redundant or improper.")

sentence of incarceration is not necessary to promote the interests of respect for law and retributive justice.

The question of what punishment is appropriate in any given case ought to take into consideration the extent to which Ms. Mack has already been punished. S*ee, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his profession); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (court properly considered "atypical punishment such as the loss of [defendant's] reputation").

Here, Ms. Mack has already been subject to house arrest for more than three years, which should be considered in weighing the need for additional confinement. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"). Moreover, Ms. Mack's once-promising acting career is a memory, she and her family are hunted by paparazzi seeking headlines and clickbait from the tale of Nxivm, and her reputation will be permanently tarnished by her association with Nxivm and Raniere. *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding that the loss of a defendant's "teaching certificate and his state pension as a result of his conduct" are appropriate considerations "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence'").

As Ms. Mack's mother tells it, "she was hounded and publicly humiliated by the media. The shame she felt was crushing her soul." ████ Mack Ltr. (Ex. 2) at 3. This resounding fallout has already inflicted grievous punishment, and we respectfully submit that a prison term is accordingly not necessary to achieve the aims of § 3553(a). *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally

29

punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials).

That conclusion is consistent with the law of this circuit.  Courts have recognized that a prison term is not necessary to serve the goals of retributive justice embodied in Section 3553(a). On the contrary, numerous courts have recognized that in an appropriate case, and if used wisely, probation is sufficiently serious punishment to satisfy statutory mandates. *See United States v. Brady*, No. 02-cr-1043, 2004 WL 86414, at *8-9 (E.D.N.Y. 2004) (Gleeson, J.) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing" (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.)); *United States v. Coughlin*, No. 06-cr-20005, 2008 WL 313099, at *5 (W.D. Ark. 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive.").  Indeed, where—as Ms. Mack has done here—a defendant has "sincerely and repeatedly expresse[d] remorse for [her] actions" and has "a strong[ ] desire to return to, and be a productive member of, his community," forgoing prison time does "not undermine the goals of achieving just punishment and promoting respect for the law."  *United States v. Hasanoff*, No. 10-CR-162 (KMW), 2020 WL 6285308, at *6 (S.D.N.Y. Oct. 27, 2020) (finding early release consistent with § 3553(a) factors). That is particularly true where, as here, at the time of the offenses a convict did not "have a good sense of [her] place in society," and "was susceptible to seeking guidance from all the wrong places."  *Id.* (quotation marks omitted).[3]

---

[3] Such an alternative sentence has other societal benefits.  A sentence of probation costs significantly less than incarceration and can be an effective means of reparation to society. A non-incarceration sentence would also further the Justice Department's stated goal of finding alternatives to incarceration in appropriate cases.  *See* United States Courts, *Incarceration Costs Significantly More than Supervision* (Aug. 17, 2017), *available at*

### III.     Deterrence and Protection of the Public (§ 3553(a)(2)(B and C))

A sentence of incarceration also is not necessary to provide either general or specific deterrence, or to protect the public.  To the contrary, it is incredible to think that other potential criminals may follow in Ms. Mack's footsteps—and endure the incredible suffering, trauma, and humiliation she has sustained—because a sentence of incarceration is not imposed here.

To start, the nearly unique nature of the criminal conduct at issue in this sentencing—in which Ms. Mack committed criminal acts while herself in the grips of a cult of which she was also a partial victim—lessens the need for general deterrence.  *Cf. Garofalo v. Gravano*, 23 F. Supp. 2d 279, 282 (E.D.N.Y. 1998) ("General deterrence is similarly inapposite.  Because his stature in organized crime is so unique, it would be fatuous to believe that the sentence imposed would encourage others to emulate his past").  Simply put, the Nxivm saga is so unusual and *sui generis* that there is an almost-null set of possible future criminals to be deterred by the sentence imposed in this case.  Even for those in the population who could be deterred, the punishment already meted out to Ms. Mack—arrest by the FBI, home confinement with severe restrictions on communication with the outside world, a felony conviction, public humiliation, stalking paparazzi, a reputation in tatters, a career in ruins, and physical and emotional scars from her twelve years serving Raniere— already provides all the deterrent necessary.  *United States v. Edwards*, 595 F.3d 1004, 1016 (9th

---

https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision (explaining that, in 2016, the cost to imprison a person after sentencing was $34,770 per year, whereas the cost to supervise a person in the community after sentencing was $4,392 per year, meaning that "[p]lacing an offender in a residential reentry center was about seven times more costly than supervision."); United States Sentencing Commission, *U.S. Sentencing Commission Announces 2017-2018 Policy Work, Proposes Guideline Amendments* (Aug. 17, 2017) *available at* https://www.ussc.gov/about/news/press-releases/august-17-2017 ("Among the proposed amendments published today are changes that would increase the number of federal offenders eligible for alternatives to incarceration. Informed by the Commission's multi-year study on recidivism, one of the proposed amendments would add a downward adjustment to the guidelines for first offenders.").

Cir. 2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration," and upholding district court's determination that probation and restitution provided adequate deterrence, despite range of 27-33 months imprisonment).

Aside from serving as a warning to other members of society, the overwhelming consequences that Ms. Mack has already suffered have more than ensured that Ms. Mack herself will never embark on any remotely similar course of conduct again. *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct"). Indeed, following her arrest and rehabilitation, Ms. Mack has publicly denounced Raniere (and her own prior association with Raniere) in the strongest possible terms. That is made clear by Ms. Mack's plea allocution, her decision to cooperate completely and fully with the government, and is further underscored in her letter to this Court as well as her efforts to demonstrate her remorse to the public generally and more specifically to those she harmed. There is thus no need to impose an additional sentence of incarceration on Ms. Mack to achieve specific deterrence.

There are, moreover, several circumstances in this case which underscore that a sentence of imprisonment is not necessary to deter Ms. Mack from engaging in similar conduct. For example, Ms. Mack is a first-time offender, and courts have observed that first-time offenders like Ms. Mack are statistically less likely to reoffend. *See, e.g., United States v. Williams*, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism"). Moreover, for offenders like Ms. Mack who have never been imprisoned, "even a short term of imprisonment can be "sufficient to impress upon [her] the seriousness of the offense and to deter others under similar circumstances." *United States v. Cull*, 446 F. Supp. 2d 961, 965

32

(E.D. Wisc. 2006). And offenders over the age of 40—which Ms. Mack will attain in two years—"exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Hernandez*, No. 1:03-cr-01257 (RWS), 2005 WL 1242344, at \*5 (S.D.N.Y. May 24, 2005).

Finally, as to general deterrence, studies have demonstrated that longer prison sentences do not necessarily serve as a general deterrent, further confirming that a sentence with no incarceration is sufficient to meet the goals of § 3553(a). *See, e.g., "Five Things About Deterrence"* Nat'l Inst. Of Justice. (2016), available at https://nij.gov/five-things/pages/deterrence.aspx ("Sending an individual convicted of a crime to prison isn't a very effective way to deter crime;" "Increasing the severity of punishment does little to deter crime"); Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is there a "Collective Wisdom"?* 59 CRIME & DELINQ. 1006, 1031-33 (2013) ("[T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves."). Studies have also shown that a longer prison sentence is unlikely to have a specific deterrent effect. "[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013). A long prison sentence for Ms. Mack—who, as set forth above, is on a promising path of rehabilitation—is thus not necessary to adequately serve the goals of deterrence.

## IV.  Provision of Needed Educational Training (§ 3553(a)(2)(D))

A sentence of imprisonment also is not necessary to furnish Ms. Mack with needed educational opportunities. To the contrary, such a sentence would interfere with the educational path she has already charted on her own under this Court's supervision.

33

When imposing sentence, Section 3553(a)(2)(D) obliges courts to consider the need for the sentence imposed to "provide the defendant with needed educational or vocational training . . . in the most effective manner." Here, we respectfully submit that this factor weighs in favor of a non-custodial sentence that will permit Ms. Mack to continue upon and complete the educational trajectory she already had begun following her arrest. As set forth in the PSR (¶ 219) and the letters of support provided to the Court, since her arrest Ms, Mack has diligently sought to "make up for lost time" in her educational development by obtaining an associate's degree from a community college in California, and is now working towards her bachelor's degree at the University of California, Berkeley.

Ms. Mack's passion and aptitude are readily apparent to her instructors. One of her professors observes that "[b]ecause she once gave up formal education, she is now visibly thirsty for knowledge, working to make up for everything that she might have missed." ▮▮▮▮ Ltr. (Ex. 9) at 2. Another says that she "is one of the most intelligent, insightful and authentic learners that I have worked with in my 25 year career as a ▮▮▮▮▮▮▮▮▮▮▮▮ Ltr. (Ex. 10) at 1. That professor also has noted that Ms. Mack remains focused on her role "as a member of the larger community and society with a positive and meaningful role to play." *Id.* at 2.

Ms. Mack is pursuing these studies with the ultimate goal of developing skills that can help others in need. This aim speaks volumes to how far she has come in her rehabilitation since her arrest little more than three years ago.

Under these circumstances, we respectfully submit that Ms. Mack's educational achievement to date, and her ability to continue that progress and obtain a degree, further support a mitigated sentence that permits Ms. Mack to continue walking the positive path she has embarked on outside of prison. *See, e.g., United States v. Nelson*, 724 F. App'x 814, 817 (11th Cir. 2018)

(noting that district court "granted a downward variance" in part because the defendant was "pursuing his education [at a community college").

**V.   The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))**

A sentence of probation or home confinement also would not create any disparity with the sentences imposed on those convicted of similar crimes.   As an initial matter, the unique circumstances of this case make it difficult to identify cases that are truly analogous.   *See, e.g.*, *Koon*, 518 U.S. at 94 ("[a]typical cases were not adequately taken into consideration" by the Guidelines, and as a result "factors that may make a case atypical provide potential bases for departure").   However, data from the U.S. Sentencing Commission makes clear that a mitigated sentence would not create unwarranted disparities vis-à-vis others convicted of violating the same statutes.

Data compiled by the Sentencing Commission demonstrates that a mitigated sentence in this case would not create unwarranted disparities as against others convicted under similar statutes and guidelines provisions.   For example, since 2015, more than 72% of female offenders in criminal history category I who were convicted of racketeering offenses received a sentence of 24 months or less.   *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (retrieving data for female offenders from fiscal years 2015 to 2020 in Criminal History Category I who were convicted of offenses where the primary guideline is § 2E1.1).   A full 97% of such offenders received a sentence of 59 months or less, and the median sentence in this population was 13 months—a sentence Ms. Mack has long since surpassed if her three years' home confinement is credited.   *Id.*

Similarly, since 2015, nearly 40% of female defendants in Criminal History Category I who were convicted of forced labor offenses received a sentence of imprisonment of 24 months or less.   *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (retrieving data for female offenders from fiscal years 2015 to 2020 in Criminal History Category I who were convicted of offenses

35

where the primary guideline is § 2H4.1).  Of those aged 40 and under, as Ms. Mack will be in two short years, 66% received sentences of fewer than 59 months, which is years less than the Guidelines range suggested by the PSR.  *Id.*

When considering similar offenders convicted of extortion crimes, the pattern is roughly the same.  More than 63% of such offenders received a sentence of 24 months or less, and nearly 94% of such offenders received a sentence of 59 months or less.  *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (retrieving data for female offenders from fiscal years 2015 to 2020 in Criminal History Category I who were convicted of offenses where the primary guideline is § 2B3.2).  In addition, since 2015, nearly 80% of female defendants in Criminal History Category I who were convicted of sex trafficking offenses received a sentence of imprisonment of 24 months or less, and 97% received a sentence of less than 59 months.  *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (retrieving data for female offenders from fiscal years 2015 to 2020 in Criminal History Category I who were convicted of offenses where the primary guideline is § 2G1.1).  The median sentence length for this group is 12 months.  *Id.*

In sum, a sentence in this case requiring no incarceration would not create unwarranted disparities against the sentences imposed on similar offenders.

*      *      *

We respectfully submit that a careful consideration of Ms. Mack's remorse and rehabilitation shows that a sentence of incarceration is not necessary to serve the goals of Section 3553(a).  Ms. Mack acknowledges that she deserves punishment, but she has already been subject to devastating consequences from her involvement with Raniere.  Nor is a sentence of incarceration necessary to deter Ms. Mack or the wider public from following a similar path.  A prison term is also not necessary to ensure Ms. Mack's access to educational opportunities; to the contrary, such

36

a sentence would frustrate Ms. Mack's ongoing education.   Finally, a mitigated sentence also would not create unwarranted disparities as against others convicted of similar crimes, but rather would be consistent with sentences meted out to others.   Accordingly, we respectfully submit that a sentence of probation or modified home confinement permitting the continuation of Ms. Mack's studies is sufficient, but not greater than necessary, to serve the goals of Section 3553(a).

## CONCLUSION

Allison Mack recognizes that she has committed grievous wrongs and that she has earned punishment.  She cannot undo what has been done, and she will have to live with the regret for the rest of her life.  But Ms. Mack still holds the potential to be valuable to society—as a family member, as a friend, as a helper to those in need and as a cautionary tale.  Since her arrest more than three years ago, Ms. Mack has completely turned her life around and recommitted to the values she lost during her time in Nxivm.  We respectfully request that the Court permit Ms. Mack to continue on this new path by imposing a sentence that does not require incarceration that would separate Ms. Mack from the family, friends, and educational opportunities that have put her on the path to once again become a valuable member of society.


Dated: New York, NY                          Respectfully submitted,
      June 25, 2021
                                              KOBRE & KIM LLP

                                                 /s/

                                              William F. McGovern
                                              Sean S. Buckley
                                              New York, New York 10022
                                              Tel: 212 488 1210 / 1253

                                              *Attorneys for Defendant Allison Mack*